# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RICKIE WILLIAMS, )<br><br>Plaintiff, )<br><br>v. )<br><br>VERIZON WASHINGTON, D.C. INC., )<br><br>Defendant. ) | No. 16-cv-0932 (KBJ) |

## MEMORANDUM OPINION

Plaintiff Rickie Williams has filed the instant lawsuit against his longtime employer, Verizon Washington, D.C. Inc. ("Verizon"), under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.* Williams's two-count complaint alleges that Verizon unlawfully interfered with his rights under the FMLA (Count I) and retaliated against him (Count II) when it terminated him after he returned to work from having taken FMLA medical leave. (*See* Am. Compl. ¶¶ 44–55.) Williams's specific allegations pertain to a saga that involved a trip to New Orleans, a lost cell phone, and Verizon's subsequent investigation into William's asserted reasons for taking leave. (*Id.* ¶¶ 17–23, 25–29, 31–41.) Williams claims that Verizon "accused him[,]" without evidence, "of feigning his illness" and "l[ying] to [Verizon]" (*id.* ¶ 53), and later unlawfully terminated him "for taking this leave, resulting in monetary loss including loss of employment" (*id.* ¶ 47).

Before this Court at present is Verizon's motion to dismiss and/or motion for summary judgment. (*See* Def.'s Mot. to Dismiss and/or Mot. for Summ. J. ("Def.'s

Mot.), ECF No. 28; Def.'s Mem. in Supp. of Mot. to Dismiss and/or Mot. for Summ. J. ("Def.'s Mem."), ECF No. 28-1.) Among other things, Verizon argues that Williams's interference claim must fail because it is duplicative of his retaliation claim, and that Verizon granted Williams the requested FMLA leave, and thus did not interfere with Williams's exercise of his FMLA rights. (*See* Def.'s Mem. at 14–17.)[1] Verizon also contends that Williams cannot prevail on the retaliation claim, because Verizon has articulated a legitimate, non-discriminatory reason for Williams's termination—namely, that during the investigation, Williams repeatedly lied to Verizon about what he was doing while he was on leave—and Williams has not assembled any evidence to show that this legitimate reason for his termination was pretextual. (*See id.* at 17–25.)

This Court has reviewed the evidence that both parties have submitted in conjunction with their briefing of Verizon's motion, and for the reasons explained below, it finds that Williams has failed to present any evidence that could support a reasonable jury finding that Verizon is liable for FMLA interference or retaliation under the circumstances presented here. Therefore, Verizon's motion will be **GRANTED**, and summary judgment will be entered in Defendant's favor on all of Williams's claims. A separate order consistent with this Memorandum Opinion will follow.

## I. BACKGROUND

### A. Basic Facts[2]

Williams began working for Verizon in 1979, and at all times relevant to this case, he worked as a systems technician at Verizon's garage in Northeast Washington,

---

[1] Page numbers herein refer to those that the Court's electronic case-filing system automatically assigns.

[2] The following facts concerning Williams's FMLA request, his travel to New Orleans, and Verizon's

D.C. (Def.'s Statement of Undisputed Material Facts ("Def.'s Stmt."), ECF No. 28-2, ¶¶ 1–2.) Williams had an approved Chronic Health Condition ("CHC") certification for migraines under the FMLA, which was effective for the 12-month period between March 8, 2013, and March 7, 2014. (*See id.* ¶¶ 16–17.) Once an employee has an approved CHC certification, absences related to that certification are automatically approved if the employee "connects the absence to his[] CHC case number when he[] calls out sick." (*Id.* ¶ 16.)

1. <u>Williams's FMLA Leave And Travel To New Orleans</u>

The events underlying Williams's leave and termination all unfold over a span of several days in March of 2014. Williams was scheduled to work on Friday, March 7; Saturday, March 8; and Monday, March 10, 2014. (*See id.* ¶ 30.) Williams's aunt passed away in New Orleans, Louisiana, on March 4 (*see id.* ¶ 28), and on March 5, Williams purchased a non-refundable plane ticket to New Orleans that would depart from the Baltimore-Washington International Airport on March 7, 2014 at 6:45 AM. (*See id.* ¶ 29.)[3]

---

subsequent investigation into his FMLA leave are not disputed, unless otherwise noted. In his opposition to Defendant's motion, Williams submitted (one day late) a "Statement of Material Facts in Dispute" in which he *paraphrases* each statement that Verizon makes in its statement of undisputed facts, in contravention of this Court's General Order and Guidelines, which requires the responding party to "restate the movant's statement of undisputed material fact" before noting any responses. (General Order and Guidelines for Civil Cases, ECF No. 6, ¶ 5(d)(iii); *see* Pl.'s Statement of Material Facts in Dispute ("Pl.'s Stmt."), ECF No. 30; *see also* Def.'s Reply in Supp. of its Mot. to Dismiss and/or Mot. for Summ. J. ("Def.'s Reply"), ECF No. 32, at 5 n.1.) Unless Williams's Statement of Material Facts explicitly notes a factual objection or dispute, this Court will construe Williams's paraphrases of Defendant's statements as an adoption of the facts as Defendant has stated them.

[3] The record is not clear on whether Williams booked the ticket before, or after, he learned of his aunt's death. The statement of undisputed facts does not speak to this point; in his amended complaint, Williams claims that he learned of his aunt's death on March 6, 2014 (*see* Am. Compl. ¶ 15)—*after* he had booked a ticket for New Orleans, which occurred the previous day.

On the morning of March 7, while he was at the airport, Williams called in sick to Verizon's FMLA telephone line, referencing his CHC certification for migraines. (*See id.* ¶¶ 32, 36; *see also* Am. Compl. ¶¶ 10, 18–19.) He boarded his flight and landed at the Charlotte Douglas International Airport for a connecting flight. (*See* Def.'s Stmt. ¶¶ 37–39.) During this layover, while he was still inside the Charlotte airport, Williams misplaced his work cell phone, which had fallen out of his pocket. (*See id.*) Around 9:50 AM, Williams's supervisor, Richard Frames, received a call from Williams's work cell phone, and an airport worker who identified himself as Mr. Sherry left a message stating that he had found the cell phone and was calling the last-dialed numbers on the phone in an effort to locate its owner. (*See id.* ¶¶ 40–41; *see also* Am. Compl. ¶ 27.) When Frames called Sherry back at 10:15 AM, Sherry said that he had located Williams and was on his way to return the cell phone to him. (*See* Def.'s Stmt. ¶ 42.)

Williams then boarded the connecting flight from Charlotte to New Orleans, and some time after his arrival in New Orleans, at approximately 1:10 PM Central Time, Williams called Frames and told him that he would not be at work the following day, March 8, 2014, "because of illness." (*Id.* ¶ 44 (internal quotation marks omitted).) Williams also called the Verizon employee responsible for keeping track of vacation hours for Williams's crew, and requested a vacation day for Monday, March 10, 2014, which is the same day that he returned to Washington, D.C. from New Orleans. (*See id.* ¶ 47.)

### 2. Verizon's Investigation And Williams's Termination

After receiving the call from Sherry and speaking to him on Williams's work phone on March 7, 2014, Williams's supervisor (Frames) notified his area manager,

William Alexander, that "Williams had called out sick that day, but his Verizon cell phone had been found in the Charlotte Airport." (*Id.* ¶ 51.) Alexander directed Frames to conduct an investigation, which included two investigatory interviews with Williams. (*See id.* ¶¶ 52, 54, 60.)

The first interview took place on Tuesday, March 11, 2014, the day that Williams returned to work after his FMLA leave and his vacation day. (*See id.* ¶¶ 48, 54.) Frames, Alexander, and Derrick Griffin, a union representative, participated in the interview. During the interview, when Williams was asked about what he did on March 7, 2014, Williams stated, "I got up, called the Center and requested FMLA leave. I to[ok] medicine, and went back to bed. I made a few calls during the day, that kind of stuff." (*Id.* ¶ 57 (internal quotation marks omitted).) After the interview, Alexander and Frames obtained the bill for Williams's company cell phone, which showed that calls had been made from Charlotte, North Carolina, and Pearl River, Louisiana, on March 7, 2014. (*See id.* ¶¶ 58–59.)

The following month, on April 21, 2014, Frames and Alexander conducted a second investigatory interview with Williams, who was accompanied by a union representative. (*See id.* ¶ 60.) At this interview, Frames asked the same questions that he had asked at the March 11 interview, and the union representative read Williams's answers from that interview, which Williams confirmed as correct. (*See id.* ¶¶ 61–62.) Frames then told Williams that they were looking into his leave because Frames had received a phone call on March 7, 2014, from someone who said he had found Williams's phone in the Charlotte airport. (*See id.* ¶ 63.) Although Williams initially said that his son had his cell phone that day, after asking for a break, Williams

"admitted that he had traveled to Louisiana for his [a]unt's funeral." (*Id.* ¶ 66.)

Williams explained that "someone died on me that Friday" (his aunt had actually passed away on Tuesday, March 4, 2014). (*Id.* ¶ 67 (internal quotation marks omitted).)

On May 9, 2014, Verizon terminated Williams for "lying about his whereabouts and misrepresenting facts" during its investigation. (*Id.* ¶ 68.) Williams's termination letter cites three violations of the Verizon Code of Conduct stemming from his misrepresentations relating to his FMLA leave, including that he "[m]isrepresented [his] health status and as a result received benefits to which [he was] not entitled[,]" that he "[f]alsified records when [he] reported [he was] sick[,]" and that he "[was] not honest and forthcoming during the investigation." Employee Contact Memorandum ("Termination Letter"), Ex. P to Pl.'s Opp'n, ECF No. 30-15, at 1–2 (listing "independent and alternate grounds for discipline"). Williams "admits he knew" that his misrepresentations about his whereabouts during Verizon's investigation violated Verizon's Code of Conduct (Def.'s Stmt. ¶ 73; *see also id.* ¶ 74), which requires employees to "be honest and forthcoming at all times during an investigation" and states that "[m]isrepresenting facts or failing to disclose facts during an investigation is strictly prohibited." (*Id.* (quoting Verizon Code of Conduct, Ex. 3 to Def.'s Mot. to Dismiss and/or Mot. for Summ. J., ECF No. 28-5, at 10).)

## B. Procedural History

Williams filed the instant FMLA lawsuit against Verizon in the Superior Court of the District of Columbia on April 13, 2016. (*See* Compl., ECF No. 1-1, at 3.) Approximately one month later, on May 17, 2016, Verizon removed Williams's action to this Court. (*See* Notice of Removal, ECF No. 1, ¶ 5.) In the original two-count complaint, Williams alleged that Verizon interfered with his FMLA rights by denying

his request for FMLA leave on March 7, 2014, and March 8, 2014, and further, that Verizon retaliated against him by accusing him of feigning his illness and subsequently terminating him.  (*See* Compl. ¶¶ 34–46.)  Verizon subsequently answered the complaint,[4] and the parties moved on to discovery.  (*See* Answer, ECF No. 4.)

During discovery, Verizon moved for sanctions pursuant to Federal Rule of Civil Procedure 11 and asked the Court to dismiss the case because Williams and his attorney had produced evidence that Verizon argued "should have placed Plaintiff's counsel on notice that certain critical allegations in the [c]omplaint are false" (Def.'s Mot. for Sanctions, ECF No. 14, at 1), and that his client's claims are not "grounded in fact" (*id.* at 2).  As grounds for this motion, Verizon explained that the original complaint represented that Williams had decided to attend his aunt's funeral in New Orleans last-minute, *after* he had already called in sick, but that Williams produced debit card records showing that he had in fact purchased his ticket two days prior, on March 5, 2014.  (*See* Mem. in Supp. of Def.'s Mot. for Sanctions, ECF No. 15, at 3.)  Verizon further contended that the original complaint's allegation that Verizon had denied Williams's FMLA leave was untrue, based on copies of FMLA paperwork that Williams had produced, which established that Verizon had in fact approved his FMLA requests for March 7 and 8, 2014.  (*See id.* at 7–8.)

The Court denied Verizon's motion for sanctions, insofar as Verizon sought dismissal of the complaint, and also declined to award attorney's fees, *see Williams v.*

---

[4] Williams initially named Verizon Communications Inc. as the defendant; the parties subsequently filed a Joint Motion to Substitute Proper Party Defendant to substitute Williams's correct employer, Verizon Washington, D.C. Inc. (ECF No. 9), which this Court granted.  (*See* Min. Order of June 29, 2016.)

*Verizon Washington, D.C. Inc.*, 322 F.R.D. 145, 146 (D.D.C. 2017), but it ordered Williams to amend his complaint to reflect the new factual allegations that came into light in discovery (*see* Min. Order of Feb. 28, 2017). Thereafter, Williams amended his complaint (*see* Am. Compl. ¶¶ 12, 46), and adjusted the interference claim to be based on the contention that "Verizon [] terminated him . . . for taking [FMLA] leave" (*id.* ¶ 47.)

On April 11, 2017, Verizon filed a motion to dismiss and/or motion for summary judgment with respect to William's Amended Complaint. Because discovery has concluded, Verizon's motion is fairly presented as one for summary judgment, and this Court will treat it as such. In its motion, Verizon argues that Williams has failed to establish a valid FMLA interference claim because his interference claim is based on the same set of facts as his retaliation claim, and that, in any event, Williams has presented no evidence that Verizon interfered with the exercise of his FMLA rights. (*See* Def.'s Mem. at 14–17.) Verizon further contends that Williams has failed to support his FMLA retaliation claim, because Williams has not shown the causation that a prima facie case for retaliation requires, and because Verizon has put forward a legitimate reason for terminating Williams—the fact that he lied during the investigation in violation of Verizon's Code of Conduct—which Williams has failed to rebut as pretextual. (*See id.* at 17–25.)

In his opposition to Verizon's motion for summary judgment, Williams appears to maintain that Verizon interfered with his exercise of rights under the FMLA, first, when his supervisors inquired into his leave, and then when they subsequently fired him, because an investigation alone "make[s] it triply difficult for an employee to

obtain FMLA[,]" and Verizon further infringed on his FMLA rights when it made the decision to fire him. (Pl.'s Opp'n to Verizon's Mot. to Dismiss and/or Mot. for Summ. J. ("Pl.'s Opp'n"), ECF No. 30, at 18; *see id.* at 11–14.) Williams also contends that his firing was retaliatory, because Verizon never ascertained whether he was actually sick during his FMLA leave, and deviated from its "usual progressive discipline policy" in a way that suggests that the stated reason for firing Williams was not the actual reason he was fired. (*Id.* at 16.)

## II. LEGAL STANDARDS

### A. FMLA Interference Claims

The FMLA provides a cause of action for an employer's interference with its employees' attempts to exercise any rights granted under the FMLA. *See* 29 U.S.C. § 2615(a)(1) ("It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."). To prevail on an FMLA interference claim, a plaintiff must "show both that her employer 'interfered with, restrained, or denied the exercise of or the attempt to exercise, any right provided' by the FMLA, and that she was prejudiced thereby." *McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*, 611 F.3d 1, 7 (D.C. Cir. 2010) (alteration omitted) (quoting 29 U.S.C. § 2615(a)(1)); *see also Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 87 (2002)).

A valid FMLA interference claim exists when an employer takes an action "with a reasonable tendency to interfere with, restrain, or deny the exercise or attempt to exercise an FMLA right[,]" even if the action "fails to actually prevent such exercise or attempt." *Gordon v. U.S. Capitol Police*, 778 F.3d 158, 165 (D.C. Cir. 2015) (internal

quotation marks and citation omitted). Thus, interference claims "include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave" or "manipulation . . . to avoid responsibilities under FMLA[.]" 29 C.F.R. § 825.220(b).

### B. FMLA Retaliation Claims

The FMLA also provides covered employees with a cause for action when an employer has taken adverse action against the employee because the employee engaged in an activity that is protected under the statute. Such retaliation claims are commonly brought under 29 U.S.C. § 2615(a)(2), which states that it is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." *Id.* § 2615(a)(2); *see Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 10 (2011) (referring to § 2615(a)(2) as an "antiretaliation provision[]"); *Gordon*, 778 F.3d at 162 (noting that "Congress derived . . . § 2615(a)(2)[] from Title VII's retaliation provision"). In this Circuit, claims arising out of an alleged act of retaliation have also been recognized under the interference provision of the statute, 29 U.S.C. § 2615(a)(1). *See Gordon*, 778 F.3d at 161 (acknowledging that a retaliation claim may arise under § 2615(a)(1) (citing *Gleklen v. Democratic Cong. Campaign Comm., Inc.,* 199 F.3d 1365, 1367–68 (D.C. Cir. 2000))); *see also Hopkins v. Grant Thornton Int'l*, 851 F. Supp. 2d 146, 152 (D.D.C. 2012) ("[U]nder 29 U.S.C. § 2615(a)(1) 'the Act's prohibition against 'interference' prohibits an employer from discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights,' *see* 29 C.F.R. § 825.220(c)."), *aff'd sub nom. Hopkins v. Grant Thornton, LLP*, 529 F. App'x 1 (D.C. Cir. 2013).

10

Regardless of the precise subsection of FMLA under which a retaliation claim arises, courts have applied the burden-shifting framework under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to evaluate retaliation claims under the FMLA. *See Gordon*, 778 F.3d at 161 (analyzing a retaliation claim arising under both § 2615(a)(1) and § 2615(a)(2) using the *McDonnell Douglas* framework). Under the *McDonnell Douglas* framework, an employee must first establish a prima facie case that creates a presumption of retaliation, by showing (1) that "the employee engaged in a protected activity under [the FMLA,]" (2) that he "was adversely affected by an employment decision[,]" and (3) that "the protected activity and the adverse employment action were causally connected." *Gordon*, 778 F.3d at 161 (internal quotation marks omitted) (quoting *Gleklen*, 199 F.3d at 1368). Once the employee has established a prima facie case, the burden then "shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802. If the employer shows a legitimate reason for the adverse action, the burden shifts back to the employee to show that the legitimate reason was pretextual—i.e., that the reason is a false one, and that the real motivation for the adverse action was to retaliate against the employee. *See Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1354 (2015).

In this Circuit, district courts applying the *McDonnell Douglas* framework at the summary judgment stage "need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*" once "an employer has asserted a legitimate, non-discriminatory reason" for the adverse employment action. *Brady v. Office of Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008) (emphasis in

original).  Although *Brady* involved claims arising under Title VII, the D.C. Circuit has held that "[t]he analytical framework for [a] claim of retaliation" under various other statutes, including the FMLA, "is essentially the same as that applicable to a claim of discrimination under Title VII."  *McFadden*, 611 F.3d at 6; *cf. Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015) (explaining that retaliation claims and discrimination claims are both analyzed under the burden-shifting framework of *McDonnell Douglas*). Accordingly, courts in this district have applied *McDonnell Douglas* to FMLA retaliation claims, *see, e.g.*, *Long v. Endocrine Soc'y*, 263 F. Supp. 3d 275, 282 (D.D.C. 2017); *Thomas v. District of Columbia*, 227 F. Supp. 3d 88, 99–100 (D.D.C. 2016), and the D.C. Circuit appears to have ratified this approach, *see McFadden*, 611 F.3d at 4 (recognizing that that the district court below "did not pause to consider [the] *prima facie* case" in "keeping with *Brady*" in its analysis of the FMLA claim); *Miles v. Howard Univ.*, 653 F. App'x 3 (D.C. Cir. 2016) (affirming the district court, which applied the *Brady* modification in the FMLA context).

### C.  Motions For Summary Judgment Under Federal Rule 56

Under Federal Rule of Civil Procedure 56, a court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A material fact is one that "might affect the outcome of the suit under the governing law," and a dispute about a material fact is only genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (internal quotation marks and citation omitted).  The movant is entitled to judgment as a matter of law if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In evaluating motions for summary judgment, a court must review all evidence in the light most favorable to the nonmoving party, and draw all inferences in the nonmoving party's favor. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam).

Importantly, it is well established that the nonmoving party must show more than "[t]he mere existence of a scintilla of evidence in support of [its] position[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also Potter v. District of Columbia*, 558 F.3d 542, 549 (D.C. Cir. 2009) ("[M]erely colorable or not significantly probative evidence . . . is insufficient to defeat a summary judgment motion." (internal quotation marks and citation omitted)). Indeed, the nonmovant must present specific facts and evidence that support its allegations and are sufficient to enable a reasonable jury to find in its favor. *See Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993) ("[A] mere unsubstantiated allegation . . . creates no genuine issue of fact and will not withstand summary judgment." (citation omitted)).

## III. ANALYSIS

The FMLA interference and FMLA retaliation claims that Williams has brought in this case are based on the same set of facts: that Verizon investigated him, and then terminated him, after he returned from taking FMLA leave. As an initial matter, there can be "a good deal of overlap" between retaliation claims and interference claims, *Gordon*, 778 F.3d at 161, as explained fully below, and the fact that Williams's two claims arise out of the same facts does not preclude the Court's consideration of both legal theories. Even so, this Court finds that Williams has failed to point to anything

with respect to either claim that would create more than a "mere existence of a scintilla of evidence" in support of Williams's claims. *Liberty Lobby, Inc.*, 477 U.S. at 252. That is, the record evidence is not sufficient to support either Williams's contention that Verizon unlawfully restrained the rightful exercise of his FMLA rights, or his claim that Verizon illegitimately discriminated against him on the basis of his having taken FMLA leave when it fired him. Consequently, Verizon is entitled to summary judgment on both counts.

### A. Williams's Amended Interference Claim Need Not Be Dismissed As Duplicative

As its opening salvo, Verizon asserts that the Court need not reach Williams's interference claim as set forth in his Amended Complaint (Count I), because it is entirely duplicative of his retaliation claim (Count II). (*See* Def.'s Mem. at 14–15.) Verizon argues that, because the FMLA provides "two distinct claims"—an interference claim under 29 U.S.C. § 2615(a)(1), and a retaliation claim under 29 U.S.C. § 2615(a)(2)—Williams cannot maintain *both* an interference claim *and* a separate retaliation claim based on the same set of facts, which, here, involve approved FMLA leave followed by the termination of Williams's employment. (*Id.* at 14 (quoting *Roseboro v. Billington*, 606 F. Supp. 2d 104, 107 (D.D.C. 2009).)

This argument is easily disposed of, as this Court has no doubt that a plaintiff alleging substantially similar facts as those that Williams asserts here can seek the simultaneous advancement of two distinct theories of FMLA liability. As noted above, retaliation claims brought under section 2615(a)(2), on the one hand, and interference claims brought under section 2615(a)(1), on the other, can sometimes "overlap[,]" *Gordon*, 778 F.3d at 161; and, indeed, the D.C. Circuit has expressly recognized that a

retaliation claim in particular can be stated under both FMLA provisions, *id*. The standard retaliation claim involves the allegation that the plaintiff's employer sought to punish him for exercising his right to take leave under the FMLA, and this claim can be deemed cognizable under the language of section 2615(a)(2), which it makes "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2); *see Gordon*, 778 F.3d at 161; *Long*, 263 F. Supp. 3d at 281. Some courts have also found that, because of the narrowness of the language in section 2615(a)(2), such facts state a claim under section 2615(a)(1). *See Thomas*, 227 F. Supp. 3d at 99 n.3 (discussing different courts' analysis of retaliation claims); *see also Gleklen*, 199 F.3d at 1367.

Moreover, and significantly for present purposes, a plaintiff can allege that his employer's retaliatory response to his use of leave has interfered with that employee's right to exercise leave in the future, implicating the FMLA's interference provision. *See Gordon*, 778 F.3d at 161 (positing a situation in which "acts of the employer that operate as retaliation for [an] initial request may also operate as interference with [] later requests for use"); *see also* 29 C.F.R. § 825.220(c) ("The Act's prohibition against interference prohibits an employer from discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights."). In light of this 'retaliatory interference' scenario, the same set of facts can actually form the basis for two different FMLA claims: that the employer unlawfully retaliated against the employee for taking leave in the past, and also that the employer's retaliatory act will substantially interfere with that employee's right to take leave in the

future. In other words, it is plausible that the same retaliatory act can undergird two different legal theories under the FMLA, and thus, separate interference and retaliation claims that pertain to only one set of actions by the employer are not necessarily duplicative.

Williams has been clear in his complaint and subsequent briefs that he wishes to bring claims for both interference and retaliation (*see, e.g.*, Am. Compl. (asserting two separate counts)), and given the legal analysis set forth above, this Court sees no reason to dismiss his interference claim as necessarily duplicative of his retaliation claim on its face. Consequently, this Court will decline to follow Verizon's suggestion that Williams's "interference claim should be dismissed with prejudice" because his claim "is one of retaliation only, not interference" (Def.'s Mem. at 15), and will proceed to analyze both claims.

### B. Williams's Interference Claim Fails Because There Is Insufficient Evidence That Verizon Discouraged The Exercise Of His Rights Under The FMLA

Both parties agree that Verizon approved Williams's request to take FMLA leave on March 7 and 8, 2014 (*see* Def.'s Stmt. ¶¶ 18, 23–24), and per Williams's amended complaint, Williams's interference claim is not based on Verizon's outright refusal of leave (*see* Am. Compl. ¶ 46). Instead, Williams's interference theory now rests on the fact that Verizon investigated his FMLA leave after his return to work, and subsequently fired him. Although Williams's legal assertions are less than clear, he appears to be making two related contentions: (1) that Verizon restrained the taking of FMLA leave by investigating the circumstances of his FMLA leave (*see* Pl.'s Opp'n at 14–15), and (2) that Verizon discouraged the taking of FMLA leave by terminating him on return from leave (*see id.* at 15–16).

16

Williams is correct when he asserts that the fact of Verizon's approval of the FMLA leave, by itself, does not preclude a valid interference claim, if Verizon nevertheless acted in a manner that had a "reasonable tendency[,]" *Gordon*, 778 F.3d at 165, to thwart the taking of FMLA leave. (*See* Pl.'s Opp'n at 11.) But, notably, Williams has not alleged, nor offered any evidence to support, that Verizon took any action with respect to Williams's *taking* leave. To the contrary, by all accounts, Williams appears to have taken the requested medical leave without hindrance, and the factual bases for Williams's interference claim—Verizon's investigation and its termination of him—occurred *after* he appears to have taken his leave successfully based on his pre-approved FMLA certification. *See Gordon*, 778 F.3d at 165 (recognizing that interference claims are "forward-looking[,]" as distinguished from "backward-looking" retaliation claims). Nor is there any evidence that Verizon dragged its feet in acquiescing to the specific instances of his leave on March 7, 2014, and March 8, 2014 after the fact. (*See* Def.'s Stmt. ¶¶ 18, 23–24.) Indeed, at the time that he called in sick and requested leave for March 8, 2014, Williams's certification for migraines had expired (*see id.* ¶¶ 19–20), but Verizon permitted Williams to obtain a FMLA certification from his physician for back pain some time later, and retroactively approved Williams's FMLA leave for March 8, 2014 based on that certification (*see id.* ¶¶ 23–24).

The best that Williams can do to sustain his interference claim on the facts presented here is to maintain that what Verizon did after he returned from FMLA leave (i.e., investigate the circumstances of Williams's leave and ultimately terminate him) discouraged any potential *future* FMLA leave he may have wanted to take. But there is

no support in the record for this theory of interference, either. As to the investigation, Williams appears to suggest that merely by asking questions about the circumstances of his FMLA leave, Verizon unlawfully discouraged the taking of any further leave, citing an Eleventh Circuit case where the employer was found to have interfered with an employee's FMLA leave by asking for additional documentation of her FMLA need. (Pl.'s Opp'n at 14–15 (citing *Diamond v. Hospice of Fla. Keys, Inc.*, 677 F. App'x 586, 594 (11th Cir. 2017)).) But in that case, the employer sought additional information as it decided whether or not to *approve* the employee's FMLA leave request. *See Diamond*, 677 F. App'x at 593–594 (finding that the employer's request for food receipts and other additional documentation in assessing the employee's "need for leave" was an impermissible attempt to "mak[e] approval of her leave requests more difficult"). Here, the evidence is clear that Verizon's investigation was not being conducted to construct additional hoops for Williams to traverse before his FMLA leave would be approved; instead, Verizon commenced investigating because of a reasonable suspicion that Williams had been deceptive about his illness on the day he invoked the FMLA. (*See* Def.'s Stmt. ¶¶ 49–52 (recounting the fact that Frames received a call from Williams's cell phone in Charlotte during Williams's FMLA leave, and Alexander directed Frames to conduct an investigation only after Frames notified him of that fact).)

Verizon's legitimate attempt to look into how Williams had conducted himself during the FMLA medical leave that Verizon had authorized was entirely warranted based on the troubling facts that were brought to the company's attention, and nothing in the record indicates that the investigation had the tendency to thwart any valid

request for medical leave by Williams in the future. Indeed, no employee who had a valid claim for medical leave and has used that leave appropriately would be bothered by the questions that Williams's supervisors asked. And to suggest otherwise, as Williams does here, is to accept the preposterous contention that employees can abuse the FMLA leave process with impunity, and that employers cannot do anything to audit or supervise the leave process, because to ask questions effectively makes it "triply difficult" for employees "to obtain FMLA" and to use it however they want, even inappropriately. (Pl.'s Opp'n at 18.) *See Sharif v. United Airlines, Inc.*, 841 F.3d 199, 206 (4th Cir. 2016) (upholding an employer's actions in terminating an employee suspected of lying about his FMLA leave, and remarking that "[w]hile a company may not deny valid requests for leave . . . it is equally important to prevent the FMLA from being abused"). This Court concludes that Verizon's legitimate investigation of what appeared to be a dubious FMLA leave claim was not an act that interfered with an employee's right to bring valid FMLA requests in the future. At most, Verizon's investigation would have deterred *false* future FMLA claims, which does not constitute interference with the exercise of FMLA rights as a matter of law.

In regard to Williams's suggestion that Verizon's termination of his employment constituted unlawful interference, it is undisputed that it was only after the company's investigation and Williams's repeated misrepresentations during the investigatory interviews that Verizon fired him. (*See* Def.'s Stmt. ¶¶ 53–71.) And in this Circuit, it is well established that "[r]ights to FMLA leave—whether in the application phase, medical certification phase, or off-work phase—do not protect an employee's job against a legitimate, unrelated, reason for separation from employment." *Hopkins*, 851

F. Supp. 2d at 155; *see also Hopkins*, 529 F. App'x at 3 (rejecting an interference claim where there was a "termination for a valid business reason"). Here, it is undisputed that Williams's misrepresentations during the investigation violated Verizon's Code of Conduct (*see* Def.'s Stmt. ¶¶ 73–74), and such a violation is a legitimate business reason for Verizon's decision to fire Williams. Williams cannot shield himself from that outcome merely because the termination of his employment also prevented the hypothetical future exercise of his FMLA rights.

Undaunted, Williams maintains that Verizon investigated his use of FMLA leave, and then terminated him, without inquiring into whether he was *really* sick, and that, ultimately, Verizon penalized him "because he was not in the District of Columbia" and "was not in bed for 24 hours" during his leave. (Pl.'s Opp'n at 15.) This construction of the facts is belied by the facts in the instant record, which establish quite clearly that Williams lied about his whereabouts when he was questioned during the investigation, and that his deceptiveness was one of the reasons for his termination. (*See* Termination Letter at 1 (stating that Verizon determined that Williams misrepresented his health status, falsified records, and was not honest and forthcoming during the investigation); *see also* Def.'s Stmt. ¶¶ 51–52, 68 (demonstrating that Williams was not terminated until after Verizon had investigated the matter for more than two months, even though it was aware that Williams had traveled to New Orleans at the outset).) Williams's suggestion that Verizon had to verify Williams's malingering before it could fire him is also inconsistent with the law, which does not mandate that an employer amass "medical documentary evidence" that an employee is "feigning his illness" (Am. Compl. ¶ 53), prior to responding to suspected FMLA leave violations. *See Sharif*, 841

F.3d at 206 (finding, in a case where plaintiff was investigated and discharged after the employer discovered that he was traveling during his FMLA leave, that the employer "had no obligation to pursue additional investigation when it had more than ample reason to believe it had been lied to[,]" as long as it had made a reasonably informed decision). Williams's similar suggestion that Verizon interfered with his exercise of FMLA rights by attaching additional restrictions to what constitutes valid FMLA leave, and firing him based on the failure to meet those made-up restrictions (*see id.* at 15 ("Their insistence that he remain in D.C. and be in bed for 24 hours is made all the more bizarre, when not a single Verizon employee determined them to be qualifying conditions for FMLA leave."); *id.* ("If he was sick, in bed, attending a funeral in Shanghai, and Verizon had notice of his leave, it is an FMLA qualifying incident.")), is likewise meritless. The record shows that Verizon's investigation was a reasonable attempt to determine what Williams actually did on the days he called in sick (*see* Def.'s Stmt. ¶¶ 56–59), in order to determine whether his request for leave was valid in light of the travel information Verizon received, and *not* an effort to impose new rules about what employees are permitted to do when they are truly sick, as Williams suggests.

For all his talk of actual illness, Williams has essentially ignored what is by far the most salient point as far as the interference claim is concerned: regardless of whether Williams actually had an FMLA-qualifying illness on March 7 and 8, 2014, Verizon was entitled to conduct an investigation based on its reasonable belief that he was not ill and was instead feigning illness and fraudulently claiming FMLA leave. *See George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005) ("[A]n employer's action may be

justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false."). If Williams was telling the truth and was in fact ill, then Verizon's investigation could very well have revealed that fact. But in the course of Verizon's inquiry, Williams told several blatant lies about his conduct while on leave (*see* Def.'s Stmt. ¶¶ 56–57, 64–67), and Verizon was entitled to treat his egregious violation of the company's Code of Conduct as the serious infraction that it was, by opting to terminate his employment. Thus, to the extent that Williams asserts an interference claim with respect to his taking of FMLA leave and Verizon's ultimate termination of his employment, there is no evidence that would allow a reasonable jury to conclude that Verizon took "action with a reasonable tendency to 'interfere with, restrain, or deny' the 'exercise or attempt to exercise' an FMLA right" when it investigated Williams, or when it terminated him after he came back from leave that it had approved. *Gordon*, 778 F.3d at 165 (quoting 29 U.S.C. § 2615(a)(1)).

## C. Williams's Retaliation Claim Fails Because There Is Insufficient Evidence That Verizon Terminated Williams With A Retaliatory Motive

In addition to claiming interference, Williams has also framed the basic facts of this matter as a retaliation claim, as asserted in Count II of his complaint. (*See* Am. Compl. ¶ 52 (alleging that Williams "engaged in protected activity when he requested FMLA leave from Verizon on March 7, 2014 and March 8, 2014"); *id.* ¶ 53 ("Verizon then retaliated against [Williams] for taking this leave, when they terminated him on May 9, 2014, when Verizon accused him without any medical documentary evidence of feigning his illness and that he lied to them during their investigations.").) Because Verizon has put forward a legitimate, non-discriminatory reason for its adverse action— namely, that Williams lied during the investigation—"the question [of] whether the

employee actually made out a prima facie case is no longer relevant and thus disappears and drops out of the picture," *Brady*, 520 F.3d at 493 (internal quotation marks and citations omitted), and Verizon's arguments about Williams's lack of a prima facie showing are not pertinent to the analysis (*see* Def.'s Mem. at 18–19).  Instead, the Court begins with the analysis of Verizon's proffered reason for Williams's termination, and concludes that Williams's retaliation claim cannot proceed to trial, because Williams has not provided sufficient evidence to support a reasonable inference that Williams's deceptiveness was not the real reason for his termination and that Verizon terminated him in retaliation for the FMLA leave that he had taken.  *See Walker*, 798 F.3d at 1093.

> 1. <u>Verizon Has Articulated A Legitimate, Non-Retaliatory Reason For Williams's Termination</u>

Verizon has put forward an undoubtedly legitimate, non-retaliatory reason for its termination of Williams's employment: that it fired Williams "for lying about his whereabouts and misrepresenting facts during an investigation."  (Def.'s Stmt. ¶ 68.)  Notably, Williams does not dispute that he knowingly told Verizon that he was at home sick in bed on March 7, 2014, when in fact he was on his way to New Orleans.  (*See id.* ¶¶ 73–74; *see also* Pl.'s Opp'n at 1.)  Moreover, as mentioned above, Verizon's Code of Conduct specifically states that employees must "be honest and forthcoming at all times during an investigation[,]" and prohibits employees from "[m]isrepresenting facts or failing to disclose facts during an investigation[.]"  (*Id.* ¶ 73 (quoting Verizon Code of Conduct at 10); *see also* Termination Letter at 2.)  Consequently, Verizon had a valid reason for terminating Williams's employment that had nothing to do with any alleged retaliation for Williams's having previously taken FMLA leave.  *See Thomas*, 227 F.

Supp. 3d at 104–08 (finding employee's ethical violation to be a legitimate reason for termination in a FMLA retaliation case); *Ghawanmeh v. Islamic Saudi Acad.*, 857 F. Supp. 2d 22, 40–41 (D.D.C. 2012) (finding, among others, that employee's violation of employer's regulations and dishonesty about health status were legitimate reasons for termination in a FMLA retaliation case); *see also Williams v. Chertoff*, 495 F. Supp. 2d 17, 35 (D.D.C. 2007) (noting, in the discrimination context, that "[t]he most common legitimate reason on which an employer might rely in disciplining an employee would be that the employee had violated an employment regulation or policy").

2. <u>Williams Has Not Shown That Verizon's Reasons for Terminating Him Were Pretextual</u>

Because Verizon has articulated a valid non-retaliatory reason for terminating Williams, the central inquiry is whether Williams's evidence "creates a material dispute on the ultimate issue of retaliation 'either directly by showing that a discriminatory reason more likely motivated [Verizon] or indirectly by showing that [Verizon's] proffered explanation is unworthy of credence.'" *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716, (1983)); *see Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008) (noting that the crucial question at this step is whether the plaintiff has produced sufficient evidence "that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis"). Williams primarily relies on the latter tack by suggesting that Verizon's reason for his termination was not the real reason, but he makes little headway in this regard.

To begin with, it is difficult for Williams to show that Verizon's proffered reason for terminating him is "unworthy of credence[,]" *Jones*, 557 F.3d at 678 (internal quotation marks and citation omitted), when he admits to much of the underlying behavior on which Verizon based his termination—he does not dispute that he was traveling to New Orleans when he requested FMLA leave for March 7 and 8, 2014 (*see* Def.'s Stmt. ¶¶ 32–36, 44, 66), nor does he maintain that he was truthful during Verizon's investigation of his whereabouts (*see id.* ¶¶ 73–74; *see also* Pl.'s Opp'n at 1 (accepting that "Williams lied during his investigation.")). *See Waterhouse v. District of Columbia*, 298 F.3d 989, 995 (D.C. Cir. 2002) ("Because [plaintiff] did not contravene—and in fact admitted—many of the deficiencies the defendants cited concerning her performance, she failed to establish that her employer's proffered explanation [was] unworthy of credence." (internal quotation marks and citations omitted)). Although Williams maintains that he was in fact ill, and thus "had an unforeseeable FMLA valid leave request" regardless of where he was physically located (Pl.'s Opp'n at 16), to the extent that he does not deny that he was traveling during his requested leave and was subsequently dishonest regarding his conduct during his leave, Williams has not cast any real doubt on the genuineness or reasonableness of Verizon's stated beliefs about his conduct. *See Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (stating that the issue in establishing pretext is "not the correctness or the desirability of the reasons offered . . . [but] whether the employer honestly believes in the reasons it offers[,]" and it is insufficient to merely "show that a reason given for a job action is not just, or fair, or sensible" (internal quotation marks and citations omitted)); *Brady*, 520 F.3d at 495 (holding that "there ordinarily is no

basis for permitting a jury to conclude that the employer is lying about the underlying facts" if the belief is reasonable).

Thus, Williams appears to base his pretext argument on the contention that Verizon "deviat[ed] from [its] usual progressive discipline policy" in terminating him, and that, absent a retaliatory motivation, Verizon would have simply suspended him, as it has previously done with other employees. (Pl.'s Opp'n at 16.) It is true that if Williams can show "an unexplained inconsistency" between how Verizon treated him versus other similarly situated Verizon employees, such an inconsistency could potentially "justify an inference of [unlawful] motive." *Lathram v. Snow*, 336 F.3d 1085, 1093 (D.C. Cir. 2003). But Williams has failed to demonstrate any such inconsistency here.

In this regard, Williams relies solely on two affidavits from two union stewards, Drucilla Jones and Derrick Griffin. (*See* Aff. of Drucilla Jones ("Jones Aff."), Ex. C to Pl.'s Opp'n, ECF No. 30-3; Aff. of Derrick Griffin ("Griffin Aff."), Ex. D to Pl.'s Opp'n, ECF No. 30-4.) Both affidavits contain bald assertions about Verizon's so-called progressive discipline policy, past practices with respect to other employees involved in misconduct, and the alleged irregularity of Verizon's treatment of Williams. (*See, e.g.*, Jones Aff. ¶ 12 ("Verizon had a practice of simply suspending employees for acts worse than that attributed to [] Williams."); Griffin Aff. ¶ 18 ("[Williams's] termination was a clear departure from Verizon's progressive discipline policy.").) But neither provides the specificity required to give rise to an inference that the referenced facts and circumstances actually pertain to similarly situated employees who were treated more favorably by Verizon than Williams was treated in this case.

As an initial matter, neither affidavit does more than merely assert that Verizon ordinarily employs a "progressive discipline policy," pursuant to which it suspends derelict employees but does not fire them. (Jones Aff. ¶ 8; Griffin Aff. ¶ 8.) In fact, Jones's affidavit specifically recognizes that Verizon "did not have a written policy for suspension[,]" and no such policy or practice is contained in Verizon's collective bargaining agreement with the union. (Jones Aff. ¶ 8; *see also* Def.'s Reply at 11 (maintaining that neither Verizon's Code of Conduct nor the collective bargaining agreement requires progressive discipline).) Griffin's affidavit purports to explain that his "knowledge and familiarity" with Verizon's progressive discipline policy comes from "attend[ing] a three[-]day training" on the grievance and termination process that the union conducts (Griffin Aff. ¶ 8), but does not cite any source that shows that Verizon actually has such a policy, much less that it has taken the position that the company will not terminate employees who lie during an investigation of potential fraud pertaining to approved FMLA leave. In fact, Verizon's Code of Conduct appears to belie the claim that Verizon has a progressive discipline policy with respect to violations of the Code, because it specifically states that termination can result from violating company policy as set forth in the Code. (Verizon Code of Conduct at 8 ("Failure to comply with any provision of this Code or company policy is a serious violation and may result in disciplinary action, *up to and including termination of employment*[.]" (emphasis added)).) *See Long*, 263 F. Supp. 3d at 286 (rejecting the argument that the employer's given reason her termination was pretextual based on its failure to follow an alleged "progressive discipline policy" where "the record ma[de] it

clear that [the employer] was not wedded to a strict" policy and the staff handbook permitted termination without first employing other measures).

Nor do Jones's or Griffin's affidavits provide any competent comparator evidence to show that Williams was actually treated differently than anyone else. *See Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995) (holding that the plaintiff must "demonstrate that all of the relevant aspects of her employment situation were 'nearly identical' to those of the [comparator]" in order to demonstrate pretext in a Title VII discrimination case). Jones's affidavit states generally that, "[i]n my 35 years' experience as a union steward representing Verizon employees, I have full and personal knowledge of employees who have been terminated under our grievance policy and Verizon has not terminated any employee for a lie or misrepresentation during a grievance or company hearing," and thus, "Williams's "termination was a deviation from [Verizon's] policy." (Jones Aff. ¶ 7.) But Jones does not provide the titles or roles of the employees she references, and she omits the specific misrepresentations these supposedly similar employees made, as well as the facts and information upon which her knowledge of their treatment is based. *See Carter v. Rubin*, 14 F. Supp. 2d 22, 39 (D.D.C. 1998) (finding that a declaration asserting that plaintiff was treated differently from others engaging in similar conduct was not probative of plaintiff's discrimination and retaliation claims because it "fail[ed] to reference any other [employee] specifically"). Similarly, although Jones makes the blanket statement that Verizon employees are "not terminated for . . . falsifying FMLA leave" (Jones Aff. ¶ 9), she includes no facts regarding comparable employees who lied about their leave, making an assessment of their similarities or dissimilarities to

Williams's case impossible. *See Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999) (holding that a plaintiff who relies on alleged comparators to show discrimination must demonstrate that the comparators were "charged with offenses of comparable seriousness" to show similarity of situation (internal quotation marks and citation omitted)). Jones's statement that "[i]t is my opinion that Verizon interfered or retaliated against Williams for using FMLA leave" (Jones Aff. ¶ 13) fares no better; such a contention is conclusory, and therefore insufficient to cast doubt on Verizon's stated, non-retaliatory explanation for Williams's termination. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (noting that "[a]ccepting [] conclusory allegations as true . . . would defeat the central purpose of the summary judgment device"); *Ransom v. Ctr. For Nonprofit Advancement*, 514 F. Supp. 2d 18, 27 (D.D.C. 2007) (finding testimony that consisted of "vague and conclusory argument without factual support" insufficient to show pretext because the statements merely stated that the employer's actions were discriminatory, without citing any "actual evidence").

The affidavit from Griffin, who accompanied Williams to his investigatory interviews (*see* Griffin Aff. ¶ 15), also falls far short of providing adequate support for its contention that Williams's termination "was a clear departure from Verizon's progressive discipline policy" (*id.* ¶ 18). Griffin's sworn statement says little more than that, insofar as it contains no information about any other specific instances of discipline by the company that could possibly form the basis of Griffin's conclusion that Verizon has a policy that it departed from with respect to Williams. And there is nothing in the record that Griffin (or Jones, for that matter) is or ever was a Verizon executive, and thereby has the power to announce that the policy of the company is that

Williams "should have been suspended for a period of days," rather than terminated. (*Id.* ¶ 17.) So, it is clear to this Court that, without more, the affidavits of Jones and Griffin cannot "by [themselves] create a disputed question of material fact concerning pretext[.]" *Miles*, 653 F. App'x at 9; *Johnson v. Perez*, 823 F.3d 701, 710 (D.C. Cir. 2016) ("Courts may grant summary judgment to a defendant where a plaintiff's evidence is vague or conclusory.").

It is also notable that Verizon has gone above and beyond to highlight the deficiency of Williams's showing, by providing evidence that specifically rebuts any claim that Williams faced inconsistent treatment in regard to his termination. Contrary to Jones's and Griffin's vague perception that Verizon allows its employees to make fraudulent misrepresentations without being fired, it appears that Verizon *has* terminated employees who are also "in the Potomac bargaining unit" (to which Williams belongs) for "providing false and misleading information during an investigation in violation of the Code of Conduct." (Def.'s Stmt. ¶ 75; *see also* Verizon Termination Letters, Ex. A–F to Decl. of Miriam T. Brooks, ECF No. 28-14, at 5–16.) And Williams's only objection to paragraph 75 of Verizon's statement of undisputed material facts is the contention that "[h]is discipline was a deviation from their normal practice per the affidavit[s] of Drucilla Jones and Derrick Griffin[.]" (Pl.'s Stmt. ¶ 75.) As such, Williams merely maintains that the Jones and Griffin affidavits ought to be given more weight than the facts that are reflected in these company documents. However earnest, Williams's own assessment of the relevant strength of the parties' evidence is not important; what matters is whether a reasonable jury could conclude that Williams's termination was an anomaly because employees are *never* terminated

for lying in an investigation as he did, and based on Verizon's exhibits and the paucity of information in Williams's affidavits, this Court concludes that it could not.

Notably, even assuming, *arguendo*, that Verizon departed from previous practice in regard to Williams's termination, that alone may still not be enough to show pretext. *Cf. Johnson v. Lehman,* 679 F.2d 918, 922 (D.C. Cir. 1982) (noting, in the discrimination context, that even where an employer has failed to follow its own established regulations, that alone is merely probative, and may not be sufficient to establish a forbidden intent). Because Verizon's written policy explicitly states that termination may result for employees who violate its Code of Conduct (*see* Verizon Code of Conduct at 8), the mere fact that Verizon could have taken a different approach—i.e., suspended him instead of terminated him—would not be sufficient to show pretext, and this is especially so in the absence of robust comparator evidence. *See Wilkerson v. Wackenhut Protective Servs., Inc.*, 813 F. Supp. 2d 61, 67 (D.D.C. 2011) (rejecting the idea that a plaintiff can "establish pretext by contending that [the employer] could have, but did not, impose progressive discipline, especially when [the employer's] policy permitted swift and severe punishment for a single [violation]" (internal citation omitted)); *cf. Sharif*, 841 F.3d at 206 (rejecting the claim that the "severity of the consequence [the employee] received is evidence of pretext").

The bottom line is this: when evaluating a retaliation claim at the summary judgment stage, the court must "consider all the evidence, taken together," and assess whether it is sufficient to support a reasonable inference of retaliation. *Jones*, 557 F.3d at 678. Thus, even for plaintiffs who create some genuine issue of material fact as to pretext, not every one "will always be deemed to have presented enough evidence to

survive summary judgment." *Aka v. Wash. Hosp. Ctr.,* 156 F.3d 1284, 1290 (D.C. Cir. 1998) (en banc).  So it is here.  Even when the evidence is viewed in the light most favorable to Williams, *see Tolan*, 134 S. Ct. at 1866, "the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision," and Williams has, at best, "created only a weak issue of fact as to whether the employer's reason was untrue[,]" *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000).  In other words, Williams has not provided evidence that would be *sufficient* for a reasonable jury to conclude that Verizon's stated reasons for firing him was mere pretext; therefore, his retaliation claim fails as a matter of law.  *See, e.g.*, *Thomas*, 227 F. Supp. 3d at 111; *Long*, 263 F. Supp. 3d at 288.

## IV.    CONCLUSION

For the reasons explained above, this Court finds that Williams has not adduced sufficient evidence to support his claim that Verizon interfered with, or otherwise attempted to restrain, any exercise of his rights protected by the FMLA, and the Court also concludes that no reasonable jury could find based on the instant record evidence that Verizon terminated Williams with a retaliatory motive.  Therefore, as set forth in the accompanying order, Verizon's motion for summary judgment will be **GRANTED**, and judgment will be entered in Defendant's favor on all claims.

DATE:  March 31, 2018

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge